**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 2:25-cr-238 |
| | ) | |
| MICHAEL STOFFER, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM ORDER</u>

On January 29, 2025, Defendant Michael Stoffer was doing laundry in a common laundry room of an apartment building. Pittsburgh police were patrolling the apartment complex, entered the laundry room, and saw Mr. Stoffer in front of the machines. They noticed a gun in his waist band, and so immediately approached him, seized the gun, cuffed him, and then asked some questions. Exhibit 1 at 00:09–03:08 (frame at 00:15 showing a view of Mr. Stoffer's gun in his waist band). Mr. Stoffer readily confessed that he didn't have a license for the gun. As a result, the Allegheny County District Attorney's Office charged and prosecuted him for felony possession and carrying a firearm without a license.[1] *See* Def.'s Omnibus Pretrial Mot. at 1, *Commonwealth v. Michael Stoffer*, CC No. 2025-1435 (Pa. Ct. Com. Pl. Allegheny Cty. Jul. 1, 2025).

In that case, Mr. Stoffer successfully moved to suppress evidence of the gun. The trial judge, relying on Pennsylvania Supreme Court case *Commonwealth v. Hicks*, held that the officers lacked reasonable suspicion to detain Mr. Stoffer. 208 A.3d 916 (Pa. 2016); Tr. of Suppression Hr'g at 38:16–21, *Commonwealth v. Stoffer*, CC No. 2025-1435 (Pa. Ct. Com. Pl. Allegheny Cty. Aug. 22, 2025). The only basis for

---

[1] The DA also charged Mr. Stoffer with possession of a controlled substance based on drugs seized during his arrest. *See* Def.'s Omnibus Pretrial Mot. at 1, *Stoffer*.

the *Terry* stop was the presence of a firearm in his waist band, and because Pennsylvania law allows concealed carry, solely possessing a firearm cannot give rise to reasonable suspicion of any crime.  Tr. of Suppression Hr'g, *Stoffer* at 32:1–34:9. After the state court suppressed the evidence (*i.e.*, the gun and other evidence seized, and the statements Mr. Stoffer made to the officers), the DA dropped the charges.  *Id.* at 40:8–9.

On September 16, 2025, the government indicted Mr. Stoffer in this case on a federal firearm charge (18 U.S.C. 922(g)(1)) based on the same conduct at issue in the dismissed state case.  ECF 3.  Mr. Stoffer moved to suppress on similar grounds.  ECF 26.  The parties briefed the issue, ECF 31, 32; the Court held an evidentiary hearing, ECF 39; and the matter is now ready for disposition.

On careful review, the Court grants the suppression motion, for essentially the same reasons that the trial judge did in the state case.  All parties agree that carrying a firearm, alone, in a state that authorizes concealed carry, cannot give rise to reasonable suspicion.  ECF 26 at 4; ECF 31 at 6.  That is settled based on not only Pennsylvania state law, but also long-standing precedent from the Third Circuit. *United States v. Ubiles*, 224 F.3d 213, 214 (3d Cir. 2000) (reversing denial of motion to suppress after police stopped defendant based only on an anonymous tip and his possession of a firearm in the Virgin Islands, where there is no presumption of illegality); *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (affirming grant of motion to suppress because mere "possession of a firearm in the Virgin Islands, in and of itself, does not provide officers with reasonable suspicion"); *cf. United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (finding that a tip combined with defendant's possession of a firearm created reasonable suspicion only "because carrying a concealed handgun is presumptively a crime in Delaware").

The government's main argument here is largely factual—that is, there were more circumstances than just the gun that created reasonable suspicion: it was late

2

at night (about 11:30 p.m.); Mr. Stoffer wasn't doing laundry; the gun was sticking out of his sweatpants; this was a high-crime apartment complex; and the officers were told that there had been criminal activities in the complex's laundry rooms (drug use, robberies, evicted residents residing in the rooms), so all laundry rooms were locked. ECF 31 at 4–6.

As a factual matter, the Court disagrees. After considering the testimony at the hearing and reviewing the exhibits, including the body cam footage, the Court finds as follows.

First, there was nothing inherently suspicious about Mr. Stoffer doing laundry late at night, which is perfectly normal for people living in an apartment building. When the officers entered the room, one of the laundry machines visibly had time left on its cycle, so the Court finds that Mr. Stoffer was doing his laundry and, based on the Court's assessment of the credibility of the officer testimony and review of the video footage, the Court finds that it is more likely than not that the officers observed Mr. Stoffer doing his laundry. Exhibit 1 at 00:09–00:23, 05:36; ECF 41 at 35:25–37:5, 56:19–58:2. The Court further finds that: (1) Mr. Stoffer made no threatening or furtive moves towards the officers; (2) Mr. Stoffer's securing the gun in his waistband, while not a model of firearm safety, doesn't materially change the calculus, *see Hicks*, 208 A.3d at 922 ("there was nothing unlawful about [defendant's] possession of his handgun, nor the manner in which he carried it"—"put[ting] the firearm in his waistband [and] cover[ing] it with his shirt"); (3) the officers were not at risk of harm; and (4) the officers did not subjectively or objectively believe that they were at risk. These findings are based on the officers' testimony and the bodycam footage showing how the officers entered the room, where Mr. Stoffer was positioned, and that it was a well-lit room. Exhibit 1 at 00:09–00:23; ECF 41 at 15:13–21:16, 27:24–34:13, 55:10–61:9.

Second, the Court doesn't view as entirely credible the officers' testimony that a manager at the apartment complex passed on information that all laundry rooms were to be locked and not used at all after a certain hour.[2]  ECF 41 at 11:5–15:12, 26:18–27:20, 51:8–10; 55:3–7.  This testimony was extremely vague, including on whether the officers were specifically told that residents couldn't be in the laundry room after a certain time,[3] or that residents weren't allowed in at all.  Indeed, it appears that the officers knew that residents could still do their laundry, but had to use a key to access the laundry room.  *Id.* at 26:18–27:2.  Moreover, in the state-court proceeding, one of the officers appeared to suggest that not all laundry rooms were to be locked (*i.e.,* only "certain" ones), and that the officers were to assess basically whether there were any broken-into rooms and trespassers in any of the rooms.  Tr. of Suppression Hr'g, *Stoffer* at 7:14–22.  Other credible suppression hearing testimony from residents of the complex established that laundry rooms weren't locked, including the specific laundry room where Mr. Stoffer was arrested.  ECF 41 at 63:12–64:4, 65:2–66:6, 72:11–73:20; Exhibits 4–6.  Based on all of this testimony, the Court cannot conclude that the officers were told that no one was allowed in any of the laundry rooms to do laundry at the time they encountered Mr. Stoffer.  In short, simply being in the laundry room wouldn't signify any criminal behavior.

[2] Mr. Stoffer objected to this testimony at the hearing as improper hearsay.  ECF 41 at 11:1–13:20.  While hearsay is generally permissible at a suppression hearing, it must be sufficiently reliable, and it was not here.  *United States v. Montalvo-Flores*, 81 F.4th 339, 344 (3d Cir. 2023) ("hearsay testimony is admissible at suppression hearings [] and should be considered by a district court if reliable") (cleaned up).  That said, the testimony was offered not for the truth of the matter asserted, but for the officers' knowledge.  As a weight issue, however, the testimony regarding what was communicated to the officers was neither specific nor detailed enough for the Court to find it entirely complete or credible.

[3] For example, Detective Messer said he thought that no one was allowed in the laundry rooms after a certain time, but when pressed on the hours, said, "I don't recall.  I believe—I want to say after 9:00 p.m."  ECF 41 at 27:3–5.

Third, the Court accepts the testimony from the officers that they are experienced and that the apartment complex was generally known to have a fair amount of crime. ECF 41 at 6:24–10:9, 25:14–17. But that's immaterial. Downtown Pittsburgh also has a lot of crime, and experienced officers can't simply go around downtown stopping and frisking anyone who might have a gun, absent something more suspicious.[4] *See Hicks*, 208 A3d at 921 (overruling Pennsylvania's prior *Robinson* rule "that the possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed," *Commonwealth v. Robinson*, 600 A.2d 957, 959 (1991)) (cleaned up); *Ubiles*, 224 F.3d at 214 (3d Cir. 2000) (finding no reasonable suspicion for search based only on an anonymous tip because possession of a firearm doesn't create a presumption of illegality in the Virgin Islands).

In sum, based on the very specific factual record before the Court, Mr. Stoffer possessed a gun in his waistband, while doing laundry alone, in an apartment complex in a poor urban environment that has crime. That's not enough to create reasonable suspicion that criminal activity was afoot. So, the motion is granted. The fruits of the stop—specifically, including the gun and Mr. Stoffer's statements to police—are hereby suppressed and excluded as evidence.

DATED this 22nd day of April, 2026.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge

---

[4] An equally plausible inference is that it is more likely for individuals to lawfully carry firearms for protection in areas known to be high crime.